IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 16, 2008 Session

**IN RE ESTATE OF LUCILLE RAY**

**HEIRS OF HOWARD RAY**
**v.**
**MAGDALENE LONG AND JOSHUA ("JOSH") TODD CREWS**

An Appeal from the Chancery Court for Wayne County
No. 11378     Robert L. Jones, Chancellor

No. M2007-01799-COA-R3-CV - Filed December 30, 2008

This is a will contest. The decedent had three children, two daughters who survived her and a son who predeceased her. Two months before the decedent's death, she executed a will that left all of her property to her daughters and some of their family members, but left nothing to any of the six children of the predeceased son. After the decedent's death, one of the daughters sought to probate the will. The deceased son's children filed this petition to contest the will, arguing that it was procured through undue influence. After a jury trial, the jury found that the will had not been procured through undue influence and was, therefore, valid. The son's children now appeal the jury verdict. We affirm, concluding that the evidence in the record supports the jury verdict.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, J., and WALTER C. KURTZ, SP. J., joined.

Judy A. Oxford, Franklin, Tennessee, for the appellants, Heirs of Howard Ray.

Randy Hillhouse, Lawrenceburg, Tennessee, for the appellees, Magdalene Long and Joshua Crews.

**OPINION**

Lucille Ray ("Decedent") and her husband, Carry Floyd Ray, lived on 350 to 400 acres of land in Wayne County, Tennessee. The Decedent's husband predeceased her on July 1, 1996. The Decedent died on December 14, 2003, at eighty-eight years of age.

The Decedent and her husband had three children, two of whom survived the Decedent and one who predeceased her. The two surviving children are Defendant/Appellee Magdalene Long

("Long") and Joyce Hess ("Hess"). The child who predeceased her was Howard Ray, who died in June 1999. Howard Ray and his wife, Betty, had six children, the Plaintiffs/Appellants in this action: Roger Ray, Karen Crews, Larry Ray, Julia Ducharme, Diann Portis, and Pam Ebert (collectively, "Plaintiffs").

On October 13, 2003, two months before her death, the Decedent executed her Last Will and Testament ("Will"), naming Long as the executrix. In the Will, the Decedent left all of her property to Long, Hess, and to some of the children and grandchildren of Long and Hess. The Will totally excluded the family of her deceased son, Howard Ray.

On November 25, 2003, a few weeks after she executed the Will and less than a month before her death, the Decedent transferred about 140 acres of the Wayne County property to her great-grandson (Long's grandson), Defendant/Appellee Joshua ("Josh") Todd Crews, for the stated price of $33,500. This property comprised about a third of the Decedent's total real estate holdings.[1]

On February 26, 2004, Long filed a petition in probate court to probate the Will executed on October 13, 2003. An order was entered that day naming Long as the executrix of the Decedent's estate. On the same day, the Plaintiffs filed a lawsuit in the chancery court below against Long and Josh Crews (collectively, "Defendants") to set aside the November 2003 sale of property from the Decedent to Josh and to enjoin Long from disposing of the Decedent's assets. On September 28, 2004, the Plaintiffs filed a will contest in the probate court, alleging that the October 13, 2003 document was not the Decedent's last will and testament, because the Decedent lacked the testamentary capacity to make it, and because it was procured through undue influence.[2] The chancery court lawsuit and the will contest were consolidated and transferred to the chancery court below.

Discovery ensued. On October 16, 2006, the Defendants filed a motion for summary judgment asserting that the Decedent was competent when she executed her Will, and that no undue influence was exerted over the Decedent in the execution of the Will. In response, the Plaintiffs did not contest the mental competency of the Decedent at the time she signed her Will. They claimed, however, that genuine issues of material fact existed with respect to undue influence. After a hearing, the parties reached an agreement on the motion. Consequently, on January 11, 2007, the trial court entered an order on the summary judgment motion that had the effect of narrowing the issues, leaving as the only issue for trial the issue of Defendant Long's undue influence over the Decedent. The matter was then set for trial.

---

[1] This appears to be the same 139.9 acres that was devised to Josh Crews and his sister, Emily Crews Maghielse, in the Decedent's Will.

[2] In the will contest petition, the Plaintiffs also argued that the purported Will should be set aside because the Decedent had contracted with her husband that all the property owned by them would be given to their children in equal shares. This allegation was apparently abandoned by the Plaintiffs before the trial.

The two-day trial was conducted on March 5 and 6, 2007. Seventeen witnesses testified. At the outset, the jury heard testimony from James Ross ("Ross"), the attorney who drafted the Decedent's Will, about the execution of the Will.[3] Ross had known the Decedent since about 1992 and described her as "feisty." On the day the Decedent signed the Will, he said, she "was doing pretty good" for an eighty-eight year old woman. Long had accompanied the Decedent to Ross's office, but was not involved in his discussions with the Decedent about her Will. Ross explicitly discussed with the Decedent the fact that she did not want to include some people in her Will that might otherwise have been included. He had "no question" that the Will set forth the manner in which the Decedent wanted to dispose of her property, and that the devises were made freely and voluntarily.

Two secretaries employed by Ross, both of whom witnessed the Decedent's Will, also testified. They described the Decedent as competent and friendly. Both recalled that Long accompanied the Decedent to Ross's office on more than one occasion. One of the secretaries testified that Ross asked the Decedent if she had read the Will, if she understood it, and if it disposed of her property in the way that she wanted, and that the Decedent answered all of the questions affirmatively.

The jury also heard testimony from Betty Ray ("Betty"), the widow of Howard Ray, the Decedent's deceased son. Betty described her relationship with the Decedent as close. She said that, after the Decedent's husband died, Howard Ray and Long disagreed about whether to sell some of their father's cows and other items. After Howard Ray told the Decedent that Long and her husband were "fixing to take everything she had," Betty said, the Decedent told Betty that she felt that she needed to sell her property because Howard was not well and she had no one else to help her with the farm. Betty testified that she and Long also disagreed about the Decedent's sale of some of her land to Josh Crews in November 2003. Betty claimed that the Decedent told her that she intended for everything to be divided equally among her three children at her death, but she felt she had no choice but to sell her property to Josh because she needed the money. By the late 1990s, Betty said, the Decedent was nervous, had high blood pressure, had reading difficulty, and could not see well enough to read a magazine or write a check, let alone her new Will.

The Plaintiffs submitted corroborating testimony by other relatives that the Decedent's eyesight was too poor to be able to read the Will. One relative testified that, in the months before her death, the Decedent's eyesight was so poor that she asked people to identify themselves when they entered the room.

Two of the Plaintiffs, Karen Crews ("Karen") and Julia Ducharme ("Julia"), testified at trial. Both said that their family had a good relationship with Long until the death of their father, Howard Ray. After his death, both claimed, Long was not as loving toward Howard Ray's children and made them feel like they were no longer part of the family.

---

[3]Ross had drafted the Decedent's husband's will prior to his death, and he had represented Long in a worker's compensation case in 1995 or 1996.

Karen said the Decedent told Karen of her plans to transfer some of her land to Josh, stating that she had no choice because she needed the money. Karen tried to persuade the Decedent not to sell the land until they could speak again. While Karen was out of town, however, the Decedent signed her Will and later nervously told Karen that the land transfer to Josh was a "done deal." After that, Karen said, the Decedent's telephone was disconnected and the Decedent was spirited away to Chattanooga and Memphis to visit with Joyce Hess and her family.

The Decedent's oldest grandchild, Plaintiff Roger Ray, testified that he lived near the Decedent and, until 1998, saw her two or three times a week and helped her with chores on her farm. Starting in 1998, his employment required him to be gone much of the time, and he saw the Decedent only two or three times a year until her death. In early October 2003, Roger Ray learned that the Decedent planned to transfer some of her land to Josh. He visited the Decedent while she was at Long's house, to express his interest in purchasing some of the Decedent's land. During the discussion, he said, Long walked in the room, stopped the conversation, and said, "I don't want to hear anything else." Without raising his voice, Roger Ray said, he walked out and said, "I'm through with the whole bunch of you." He later told his aunt, Joyce Hess, that he would not be at the Decedent's funeral. He in fact did not attend the Decedent's funeral, but explained that this was because, at the time, he had recently undergone surgery and could not attend for medical reasons.

Long testified at trial. She has two children, Anthony Long and Kathy Crews (Josh's mother). From the time the Decedent's husband died in 1996, Long had the Decedent's power of attorney, paid all of the Decedent's bills, and took care of all her financial dealings.

Long testified that she took the Decedent to see attorney Ross several times, and was at Ross's office when the Decedent signed her Will.[4] The Decedent talked to Long about the Will before she signed it, but Long maintained that she did not influence either Attorney Ross or her mother in the making of her Will. Long was unsure whether the Decedent was able to read the Will, and she had previously testified in her deposition that her mother's eyesight had prevented her from being able to read for the last fifteen years.

The day the Will was signed, Long took the Decedent to her physician to make sure that she was competent and "knew what she was doing." Long said that the Decedent knew exactly what she wanted to do, but was suffering from a broken heart because her grandchildren had turned against her.

Long said that, in October 2003, the Plaintiffs had been calling the Decedent about her disposition of property, upsetting the Decedent. Consequently, on October 6, 2003, just before the Will was signed, Long changed the Decedent's telephone number to an unlisted number and did not tell the Plaintiffs or the Decedent's sister her new telephone number. After the Will was signed, Long took the Decedent to Chattanooga to visit with her other daughter, Joyce Hess, for two weeks.

---

[4] In her deposition, Long said that she was in the room when the Decedent signed her Will, but at trial, she could not recall whether she was in the room at the Will signing or at the later deed signing.

In December, about a week before the Decedent died, Long took the Decedent to Memphis to stay with Hess's daughter, Kimberly. Two days after the Decedent returned from Memphis, she was admitted to the hospital. Long did not call the Plaintiffs or the Decedent's sister to tell them that the Decedent had been hospitalized; she claimed this was because Roger Ray had told her not to bother telling his family anything about the Decedent's condition, because they would not come to her funeral if she died. The Decedent died about a week after she was admitted to the hospital.

Long testified that, except for Roger Ray, the Decedent did not have a close relationship with the Plaintiffs after Howard Ray died in 1999. She maintained that Betty Ray had not been close to the Decedent, as Betty had claimed. Long said that the Plaintiffs did not visit or contact the Decedent and had little to do with her, and that Roger Ray was angry with the Decedent about selling her property before she died and had ended their relationship.

Josh Crews testified at trial that he saw the Decedent two or three times per week during 2003. Josh claimed that, on November 25, 2003, the Decedent gave him 139.9 acres of land for $5.00. However, the deed showed that the consideration for the transfer was $33,500.

The Defendants submitted the testimony of witnesses who knew the Decedent, saw her on a regular basis, and believed that she was mentally competent until her death. One witness opined that no one could "tell [the Decedent] what to do."

Joyce Hess, who lived in Chattanooga, also testified at trial. Hess has two children, Mike and Kimberly. Kimberly was a beneficiary under the Decedent's Will, but Mike was not. Hess said that she visited her mother whenever she could, and that she spoke to her on the telephone every day. Hess described the Decedent as a kind, independent, and "set-willed" person. She believed that her mother was mentally competent up until her death.

Hess corroborated Long's testimony about the events that led the Decedent to make a new Will in October 2003. Sometime in September 2003, the Decedent told Hess that she planned to sell her property. The Decedent explained to Hess that Josh and Frank Long, Long's husband, each wanted a hundred acres, and she called Hess to ask if she would want the house and the remainder of the land. Hess answered in the affirmative. The Decedent explained that Plaintiff Pam Ebert ("Ebert") had previously expressed an interest in buying ten acres, so the Decedent had Long call Ebert to see if she was still interested in doing so. According to Hess, when Long called Ebert on behalf of the Decedent for this purpose, the Plaintiffs became angry at the Decedent's plan to sell her land. Hess also said that she was talking to Long on the telephone during the confrontation between Roger Ray and the Decedent about the land sale, and she heard Roger Ray's remarks. After that, Hess suggested to Long that she change the Decedent's telephone number to an unlisted number, so as to prevent the Plaintiffs from calling and harassing the Decedent. Because of this controversy over the disposition of her property, the Decedent became resolved to make a new Will, and she visited attorney Ross for this purpose. Hess denied that either she or Long had any influence over the Decedent's decisions regarding the Will. Hess noted that she and Long would have received

more from the Decedent's estate if they had received a one-third child's share rather than the share each received under the Will as it reads.

Portions of the deposition testimony of Dr. Esmeraldo Herrera ("Dr. Herrera"), the Decedent's treating physician, were read into trial. Dr. Herrera examined the Decedent on the day she signed her Will, and he opined that the Decedent was mentally competent at that time and "very capable of making any personal and business decisions."

At the conclusion of the trial, the jury deliberated and returned a verdict in favor of the Defendants. On the jury verdict form, the jury specifically found that the Decedent had a confidential relationship with Defendant Long, but that the Will was valid because it was not obtained through undue influence. On April 2, 2007, the trial court entered a judgment on the verdict. The Plaintiffs filed a timely motion for a new trial, which was denied. The Plaintiffs now appeal.

On appeal, the Plaintiffs challenge the jury's verdict. In such a case, where "a trial court approves a jury verdict, appellate courts may only review the record to determine whether it contains material evidence to support the jury's verdict." *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 718 (Tenn. Ct. App. 1999) (citing Tenn. R. App. 13(d)). In reviewing a jury verdict, appellate courts neither reweigh the evidence nor decide where the preponderance of the evidence lies. *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 704 (Tenn. 2000). "Instead, they determine whether there is any material evidence to support the verdict, and, if there is, they must affirm the judgment." *Overstreet*, 4 S.W.3d at 718 (citing *Reynolds v. Ozark Motor Lines, Inc.*, 887 S.W.2d 822, 823 (Tenn. 1994)). Thus, in applying the "material evidence" standard, this Court must (1) take the strongest legitimate view of all the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all countervailing evidence. *Crabtree Masonry Co. v. C & R Constr., Inc.*, 575 S.W.2d 4, 5 (Tenn. 1978); *see also Foster v. Bue*, 749 S.W.2d 736, 741 (Tenn. 1988).

This Court has explained the burden placed on a will contestant who seeks to prove undue influence:

> Invalidating a will because of undue influence is generally not a simple undertaking. While undue influence can be proved either by direct or by circumstantial evidence, direct evidence is rarely available. *In re Estate of Maddox*, 60 S.W.3d 84, 88 (Tenn. Ct. App. 2001). Thus, in most cases, the contestants establish undue influence by proving the existence of suspicious circumstances warranting the conclusion that the will was not the testator's free and independent act. *Mitchell v. Smith*, 779 S.W.2d 384, 388 (Tenn. Ct. App. 1989). The courts have refrained from prescribing the type or number of suspicious circumstances necessary to invalidate a will because of undue influence. Instead, they have pointed out that the issue should "be decided by the application of sound principles and good sense to the facts of each case." *Childress v. Currie*, 74 S.W.3d at 329; *Halle v. Summerfield*, 199 Tenn. 445, 454,

-6-

287 S.W.2d 57, 61 (1956); *Harper v. Watkins*, 670 S.W.2d 611, 621 (Tenn. Ct. App. 1983).

*Kelley v. Johns*, 96 S.W.3d 189, 195 (Tenn. Ct. App. 2002). One "suspicious circumstance" supporting a finding of undue influence is a confidential relationship between the dominant party and the testatrix. However, "[p]roof of a confidential relationship alone will not support a finding of undue influence." *Id.* at 196. "[I]f a contestant has proved the existence of a confidential relationship, together with a transaction that benefits the dominant party to the relationship or another suspicious circumstance, a presumption of undue influence arises that may be rebutted only by clear and convincing evidence." *Id.* (citing *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995)). Once the presumption of undue influence arises, "the burden of going forward shifts back to the will's proponent to prove by clear and convincing evidence that the challenged transaction or gift was fair." *In re Estate of Maddox*, 60 S.W.3d 84, 89 (Tenn. Ct. App. 2001). The proponent of the will can make this showing by submitting proof that the testator received independent advice. "[P]roof of independent advice becomes necessary only when it would be difficult to show the fairness of the transaction or the competency of the testator without it." *Id.*

In this appeal, the Plaintiffs argue that no material evidence supports the jury's finding that the Decedent's Will is not invalid as the product of undue influence. They claim that they were entitled to a presumption of undue influence, because Long had a confidential relationship with the Decedent, and the Decedent's Will, a product of her influence, inured to Long's benefit. Because clear and convincing evidence did not rebut the presumption of undue influence, the Plaintiffs argue, the jury's verdict must be set aside.

From a careful review of the record, we disagree. As noted above, our standard of review mandates that we take the strongest legitimate view of the evidence in favor of the verdict and discard the evidence to the contrary. The testimony submitted by the Plaintiffs and the Defendants showed unequivocally that the Decedent was mentally competent when she made her Will on October 13, 2003. Long clearly had a confidential relationship with the Decedent, as the jury found. It is unclear whether the Decedent's Will constituted a transaction that benefitted Long; under the Will, Long received approximately one-fourth of the Decedent's estate remaining after the 140 acres was transferred to Josh Crews and his sister, Emily Crews Maghielse, whereas Long would have received one-third of the estate had she taken a child's share. Even assuming, however, that the circumstances are sufficient to raise a presumption of undue influence, sufficient evidence was submitted at trial to rebut by clear and convincing evidence the presumption that Long exerted undue influence over the Decedent with respect to her October 2003 Will. Independent advice was proven through the testimony of attorney Ross, who testified that Long did not influence the Decedent. He spoke specifically to the Decedent about excluding some of her relatives in the Will, had "no question" that the Will set forth the manner in which she wanted to dispose of her property, and believed she disposed of her property freely and voluntarily. Indeed, while the testimony showed that some family members disagreed strongly with the Decedent's decision on the disposition of her property, none of the witnesses testified that they saw Long exerting influence over the Decedent on this issue or any other issues.

The evidence clearly supports the jury's finding that the Will was not the product of undue influence and, therefore, was valid. Under these circumstances, we must affirm the trial court's judgment on the verdict.

The decision of the trial court is affirmed. Costs on appeal are to be taxed to Appellants Heirs of Howard Ray, and their surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE